UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY


UNITED STATES OF AMERICA    :
    :    **Crim. No. 12-303 (NLH)**
    :
    **V.**    :
    :
    :    <u>OPINION</u>
**ADAM LACERDA,**    :
**a/k/a "Robert Klein,"**    :
**et al.**    :


<u>**Hillman, District J.**</u>


### I.    PROCEDURAL HISTORY

This Court presided over a jury trial[1] in which the defendants Ian Resnick and Genevieve Manzoni and two others were convicted of various counts involving a devious telemarketing scheme that scammed over 300 victims of losses approximating $10,000 each. Many of the victims were elderly, unsophisticated financially, or, in the depths of the Great Recession, were in dire financial straits. Now before the court are motions by the named defendants for judgments of acquittal pursuant Fed.R.Crim.P. 29 or, in the alternative, a new trial pursuant to

---

[1]The full factual background of this case is familiar to all parties, and the Court therefore only discusses the facts relevant to the instant Motion.

Fed.R.Crim.P. 33.  For the reasons that follow, those motions will be denied.

## II.  LEGAL STANDARD

In deciding a Rule 29 motion, the Third Circuit has instructed that "'[i]t is not for [this Court] to weigh the evidence or to determine the credibility of the witnesses.'" *United States v. Dent,* 149 F.3d 180, 187 (3d Cir. 1998) (quoting *United States v. Voight,* 89 F.3d 1050, 1080 (3d Cir. 1996)). Instead, this Court "must view the evidence in the light most favorable to the government" and deny the motion "if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (internal quotation marks and citations omitted). Indeed, "[t]he evidence need not be inconsistent with every conclusion save that of guilt, so long as it establishes a case from which a jury could find the defendant guilty beyond a reasonable doubt." *United States v. Carr,* 25 F.3d 1194, 1201 (3d Cir. 1994). Accordingly, a sufficiency of the evidence claim imposes a "very heavy burden" on the defendant. *See Dent,* 149 F.3d at 187; *Carr,* 25 F.3d at 1201.

Defendant Resnick also has moved, in the alternative, for a new trial under Rule 33 because he claims that the verdict was against the weight of evidence and a miscarriage of justice.  In

deciding a Rule 33 motion based on the weight of the evidence, the Third Circuit has instructed that "[a] district court can order a new trial on the ground that the jury's verdict is contrary to the weight of the evidence only if it believes that there is a serious danger that a miscarriage of justice has occurred-that is, that an innocent person has been convicted." *United States v. Brennan,* 326 F.3d 176, 189 (3d Cir. 2003) (internal quotation marks and citation omitted). "Thus, 'motions for a new trial based on the weight of the evidence are not favored.'" *Id.* (quoting *Government of Virgin Islands v. Derricks,* 810 F.2d 50, 55 (3d Cir. 1987)). In determining whether "an innocent person has been convicted," the Third Circuit explained that a district court "does not view the evidence favorably to the Government, but instead exercises its own judgment in assessing the Government's case." *Id.*

## III.  LEGAL ANALYSIS

### A. <u>Defendant Jennifer Manzoni</u>

Manzoni offers four main arguments[2] in support of her motion.  She first argues that the circumstantial evidence

---

[2] The Court has considered the other arguments raised by Manzoni and, to the extent should arguments were timely raised and not waived by failure to raise an objection, finds them without merit.  The case agent's testimony that an email in evidence concerned the fraudulent bank settlement pitch seems evident from the document itself and questions about who authored it were raised by her own counsel.  As for testimony from the case agent that he found no evidence that customers were told about

offered to the jury that she knew of the fraudulent nature of the scheme and knowingly joined it was insufficient to prove her guilt beyond a reasonable doubt. In support of this argument, she contends among other things that she was merely a first line telephonic caller, that she used her real name, she was on the lowest rung in the sales ladder, that she merely read scripts that she did not prepare, that she only worked at the company, the VO Group, for a short period before it was searched by the FBI, and that no documents or other objective evidence supports a finding of guilt.

This argument fails. Although Manzoni was at VO Group for a short period of time before the FBI raid, the evidence showed that her role expanded after the raid as she took on the role of not only pitching deals to potential customers but closing deals. Importantly, even though the scripts changed after the raid, the misrepresentations or outright lies continued. Manzoni did not have "complaints" before her and was not working with Wyndham as she claimed, an important, even critical, misrepresentation that lured and lulled victims into the fraud.

---

timeshare foreclosure, the statement is not hearsay and a permissible summary of overwhelming evidence at trial that customers were told before the execution of the search warrant that their debt would be paid off – the very opposite of foreclosure.

Nor did VO Group have the ability to pay off time share debt, the critical element and most lucrative part of the fraud scheme. As a deal closer, Manzoni pitched the payoff price (created by her and others out of thin air) and arranged for the collection of funds from the victim. Yet, she had no contact with a mortgage company, bank, or lien holder to pay off the debt she had promised to expunge, never saw any paperwork related to those debts from financial institutions, nor could she have observed anyone else making those arrangements or payments in this operation because it was all a big lie designed to separate vulnerable and desperate timeshare owners from even more of their money. Two victims testified and that it was Manzoni who told them these numerous lies. With this evidence,[3] even if circumstantial, a reasonable juror could easily conclude beyond a reasonable doubt that Manzoni was a knowing, even integral part, of a fraud scheme as it evolved and unfolded.

Second, Manzoni argues that the lack of proof undermines the factual predicate of the Court's earlier denial of her motion to sever the unemployment fraud counts from the mail and wire fraud scheme counts. She argues that the lack of proof of

---

[3] The jury also heard evidence that Manzoni admitted to other employees, one a co-conspirator, that she knew VO was a fraudulent enterprise and that she made inconsistent statements to the FBI. Either or both of these may have properly considered by the juror and evidence of consciousness of guilt.

her knowing participation in the underlying fraud scheme proves
the absence of a transactional nexus with the unemployment
fraud.  As the Court previously ruled, there is a sufficient
transactional nexus between the alleged unemployment fraud and
the underlying telemarking making joinder of those counts
permissible.  The proof of her involvement in the fraud scheme
includes proof of where she worked, when, how she was
compensated and by how much.  Most if not all of these same
facts would have been necessary to assess whether she committed
unemployment fraud and when and by how much.

As the Court noted at oral argument, separate trials on
these counts would have involved very similar proofs.  The
manner in which the evidence went in in the tried case did
nothing to alter the Court's earlier ruling; it only reinforced
it.  The more potentially compelling argument that a finding of
guilt on the telemarketing fraud would cause the jury to infer
guilt on the unemployment fraud without the requisite proof did
not play out as the Defendant feared it would.  The Jury
acquitted on the unemployment fraud counts while convicting her
on the telemarketing fraud.  Clearly, an attentive and
discerning jury weighed the relatively weak and confusing proofs
on the unemployment scheme against the substantial evidence of
her personal involvement in the time share payoff fraud and
convicted on the latter and rejected the government's case as to

the former.  This is not prejudicial spillover.  It is our jury system at its finest.

Third, she reiterates her earlier argument at trial and the arguments of the other defendants that the government's case agent gave impermissible overview testimony essentially offering inadmissible hearsay.  The primary point raised her is the agent's occasional reference to "victims" of the defendant's crimes before those witnesses had testified.  Manzoni also questions whether the agent's characterization of certain documents and inferences he derived from them was proper and whether he gave impermissible testimony about defendant Adam Lacerda's state of mind.

First, the opinion elicited from the case agent on redirect about Adam Lacerda's reason for his anger over the contents of an email (that he didn't want evidence of their fraud written down) was in direct response to an attempt by defense counsel to get the case agent to admit that Lacerda's angry outburst was evidence of his innocence (he was angry because he had discovered his employees were lying to customers).  This was fair rebuttal and in any event did not relate at all to Manzoni's state of mind and hence was not prejudicial to her.

As for the agent's comments concerning his view that notes on Manzoni's desk reflected commissions this would appear to be

admissible under Fed.R.Evid. 701.  The agent's testimony was based on his extensive investigation of how the VO Group operated and paid its employees.   To that extent it was based on that investigation his opinion was "rationally based on the witness's perception."  This commonly employed compensation method for sales people hardly required the expertise of a forensic accountant.  Even if not admissible as such, it was at worst cumulative.  That Manzoni was paid by commission was not in dispute and the fact that she kept such records on her desk could hardly be characterized as prejudicial.

As for the issue of the agent's characterization of certain people as "victims", vigorously raised at trial and reasserted here, we view this as more sound and fury than substance.  That an FBI agent would begin an investigation, expand it after a preliminary view of the evidence, take various investigative steps including interviewing numerous witnesses, examining documents and other tangible evidence, obtaining confessions and admissions and signing up cooperating witness who would testify to victimizing clients, and then recommending charges to the U.S. Attorney after concluding that citizens had been victims of a financial crime hardly seems a surprising or unusual process even to a lay juror.

What would truly be shocking would be an agent recommending charges after an investigation that concluded there were no victims. We pause to note here that a criminal trial is an adversarial process. The government contends the defendants committed crimes, that real people were victims of financial fraud and would testify as such, that cooperators will admit to their roles in the crime, and the investigation and evidence derived from that investigation proves the guilt of the charged defendants. The defense takes the opposite tact – that there was no fraud or, as in this case, if there was a fraud my client was not involved and the only fraud was that admitted to by the cooperators who have blamed others falsely to save their own hides. That each side would take up its respective banner and fly it high and that its witnesses would support that theme, within the rules of evidence, is the normal process of almost any criminal trial.

This is not to say that the defendants have not expressed a meaningful concern or potential problem. That a federal law enforcement agent may view a citizen as a victim it just that – his or her view. And any assumption of that fact by the jury simply because an agent made that characterization would surely pervert the truth-seeking adversarial process lauded above and intrude on the proper role of the jury. But in the view of this Court that risk is at best speculative and contrary to the

efforts and results at trial.  Throughout the trial, the Court
reiterated to the jury as early as voir dire and through opening
remarks, in curative instructions during the trial, and in its
final instructions, that the jury, and only the jury, was the
finder of facts, the sole judges of credibility, and that they
were free to believe all, or none, or some, of any witness's
testimony, law enforcement agents included.

In the process of voir dire each juror acknowledged to
their assent to the principle that a law enforcement officer's
testimony was to be given the same weight as any other witness.
That the jury took these instructions to heart and followed them
is evident from their verdict, acquitting one defendant all
together and, as noted, acquitting Manzoni of several counts.
This was a jury swayed by evidence and not afraid to reject
unsupported inferences.

Fourth, she argues that the testimony of the witness David
Jasper, conveyed to the jury by way of an audio tape and
proffered against another defendant and the defendant's witness
as impeachment, devolved into impermissible hearsay testimony
about Manzoni derived from her conversations with Jasper's wife,
Marie.  This argument is without merit.  First, Marie Jasper
testified and at trial and in emotional testimony described how
Manzoni had lied to her to obtain money.  Of course, the fact

that an out-of-court declarant later testifies at trial does not make their prior hearsay statements admissible, but it does blunt to a significant degree the alleged prejudicial effect of hearing what David Jasper said his wife had said earlier.

More importantly, the tape was not offered and admitted for the truth of Marie Jasper's out of court statements. The tape itself was a business record, and the second layer of hearsay – Marie Jasper's statements to her husband – were properly offered to show the context and motive for Dennis Nadeau's pre-trial efforts at witness tampering, a plan orchestrated and directed by Manzoni's co-defendants Ashley and Adam Lacerda. That Dennis Nadeau engaged in witness tampering is clear. He has pled guilty to that crime and is awaiting sentencing before this Court. Any potential spill over was negated by this Court's repeated curative instructions that the evidence be considered only to impeach Nadeau and as evidence of the Lacerda's witness tampering and not as substantive evidence against Manzoni.

## B. **Defendant Ian Resnick**

Defendant Resnick adopts and amplifies some of these arguments contending that some of the overview testimony focused on alleged victims that did not testify. Resnick also argues that the overview testimony was so extensive it created a pervasive taint over the trial. Like Manzoni, Resnick also

argues that no rational juror could find him guilty on the evidence. Again, like Manzoni, his arguments lack merit.

Taking the last argument first, there was overwhelming evidence from which a rational juror could conclude that Ian Resnick was not only a knowing participant but a significant manager of this elaborate fraud scheme.

First, the jury heard evidence that Resnick provided the conspirators with a list of Resnick's Wyndham customers, lists that played a key role in the initial fraudulent sales pitch because it reinforced the lie that VO Group was acting on Wyndham's behalf. The jury also heard evidence that Resnick was trained by Adam Lacerda, made the fraudulent bank settlement pitch personally,[4] lied to customers about representing banks, and made up settlement numbers. They also heard evidence that he became Adam Lacerda's close confidant and enforcer, disciplining employees, and become one of the firm's highest paid employees directly benefitting financially from the small army of fraudsters employed by the VO Group boiler room operation.

---

[4] Ricky Baker testified that Resnick defrauded him using the bank settlement pitch and used the mail and interstate wires in furtherance of the scheme. In addition to Count 1, this evidence was sufficient for rational juror to find Resnick guilty of Counts 18, 32, and 33.

His skills at deception and high pressure sales were so good, one of his two main roles at the end was to close deals lower level employees could not, taking their commission for himself. As the Court noted at trial, it would more than reasonable for a juror to conclude that the "Reaper" would have to know how the fraud worked to be an effective deal closer. His other main role at the end was damage control, attempting to placate customers who had been victimized, lying to them or deceiving them all over again.

The vast evidence that Resnick was one of the leaders of the VO Group fraud demonstrates that the jury could have easily concluded that Dorothy Gerlach was a victim of the conspiracy and convict Resnick on the substantive counts involving her. His Confrontation Clause argument was not timely raised and even if it had it would be without merit. The underlying business records of VO Group showing that Gerlach was a victim of the bank settlement fraud was not testimonial. The records showed what Resnick admitted, that he talked to her about a bank settlement and she dutifully mailed in her $14,500 check as he arranged. Of course, there was no bank settlement because as Resnick knew VO Group did not represent banks as they claimed. As with the other Counts of which he was found guilty, a rational juror could easily conclude all of the elements of the

mail and wire fraud counts (Counts 20 and 34) had been established beyond a reasonable doubt.

Lastly, his argument of taint because the agent viewed certain customers as victims is no more convincing than Manzoni's same argument. That VO Group acted to defraud its customers was not in serious dispute at trial. Rather the issue was whether the fraud was committed solely by the numerous cooperators, the individual defendants on trial arguing that they were well meaning consumer advocates duped by the former employees along with the customers. The jury did not believe it, and not because the agent thought the same – because the evidence convincingly proved they were active and at times vital participants in the conspiracy. In sum, viewing the evidence in the light most favorable to the government the evidence established a case from which a jury could find that both Manzoni and Resnick were guilty of each of the counts of which they were convicted. Their respective Rule 29 motions will be denied.

## C. **Rule 33**

The Court concludes similarly that their respective Rule 33 motions are without merit. There is no serious danger – indeed no danger at all - that a miscarriage of justice occurred and that an innocent person was convicted. On the contrary, the

evidence showed that while neither Resnick nor Manzoni drafted the fraudulent bank settlement pitch that they both made the pitch personally, directed the payment of money to the firm, benefitted from the scheme, had management roles, and had every reason to know the representations that their customer's bank debt would be paid off were false.  This description of the evidence merely scratches the surface but is more than enough to conclude their knowing and willful participation in a callous fraud that targeted the vulnerable.  There is no injustice in the conviction of those like Resnick and Manzoni who knowingly furthered and profited from the goals of this sinister conspiracy.


## IV. CONCLUSION

For the reasons set forth above, the Court will deny the post-trial motions of defendants Manzoni and Resnick.

An appropriate Order follows.




                                        ___s/ Noel L. Hillman___
At Camden, New Jersey                   NOEL L. HILLMAN, U.S.D.J.
Dated:  _June 29, 2015_